May it please the Court, I'm Brian Brosnahan, and I represent the plaintiffs and appellants in this matter. Apologies to my opposing counsel, still collecting documents. If I may, Your Honors, I'd like to reserve five minutes for rebuttal. You may, but that shows the entire time, so you'll have to help keep track. As we've shown in the papers, plaintiffs raised questions of fact about each of the claims they brought challenging the discriminatory policies of the city and the county that place the plaintiff islands in a second-class status by frustrating the development of infrastructure in the plaintiff islands and their ultimate annexation to the city that surrounds them. Yet the district court rejected all of these claims without a trial and, indeed, without even a hearing on any of the four summary judgment motions that were presented. In my limited time this morning ---- I'm not sure. When you say without a hearing, you mean you didn't get to argue the summary judgment motion? That's correct, Your Honor. We requested argument, but we got no argument. The request was denied on all of the summary judgment motions. There was a sequence of four motions, and there were no hearings on any of them. Now, in my limited time this morning, I would like to address a few key legal issues, unless, of course, the Court would like me to address other issues. The first of those legal issues concerns the application of the continuing violations rule to the statute of limitations issue on the claim concerning the master tax-sharing agreement, also called the MTSA. The second issue I'd like to address is the application of Section 3604B of the Fair Housing Act to discrimination claims by existing homeowners, that is, people who have already bought or rented properties. And then I'd like to touch very briefly on the California Fair Employment and Housing Act issues. Now, turning to the statute of limitations issue, the trial court found that the statute of limitations barred plaintiff's claims because the ill effects of the discriminatory exclusion of the Latino islands were supposedly the inevitable consequences of the original operative decision. I submit that this is inexplicable. It's inconsistent with the trial court's own factual findings, and it reflects a misunderstanding of the continuing violations rule. The MTSA is an ongoing policy of discrimination. It is not a discrete event that happens once and then it's over. It continues in effect. It is essentially an at-will agreement between the city and the county that is renewed automatically each year unless one of them wants to cease renewing it, and indeed they amend it whenever they want to, as they did in 1996 and as they did in 2004. And it has ongoing ill effects. There are two kinds of effects as to which there was evidence in the trial court. First, it deters or chills organizing efforts by the plaintiffs to organize the neighborhoods for annexation. The trial court specifically found that there were these continuing ill effects of the continuing renewal of the MTSA. I wonder if you're making the strongest argument available to you with respect to the statute of limitations. I wonder whether the fact that the agreement was reaffirmed in 2004, rather expressly reaffirmed textually, doesn't do more for you on the statute of limitations. Your Honor, I think these are alternative grounds. We've argued both of them. I myself go back and forth sometimes about which one I think is stronger. And I certainly agree with Your Honor that the express reaffirmance of the MTSA in 2004, if you view that as a discreet act rather than a continuing violation, that would defeat the statute of limitations argument as well. But on the continuing violation issue, which you've got. I don't know how much time you want to spend on the statute of limitations. Very well, Your Honor. I'll be happy to move on to the Fair Housing Act issues. Please. The issue presented is whether Section 3604B applies to post-acquisition discrimination. And this, of course, is a straight question of statutory interpretation. So I'd like to begin with the language of the statute, and I'd like to go through it with some care and in some detail, which I don't think has been done in either the Halperin or the Cox case, which are the principal cases on which the defendants rely. And the language appears in many places in the briefs, but I think that page 2A of the appendix of the plaintiff's opening brief is probably the easiest place to find the language. Now, Section 3604B makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection therewith because of race, color, religion, sex, familial status, or national origin. Now, there are, I submit, two ways to read this language to prohibit post-acquisition discrimination. The first of those two ways that I'll describe is, I think, the simplest. It focuses on the word therewith, and it asks whether therewith refers to a dwelling or to the sale or rental of a dwelling. The plaintiffs, of course, contend that it refers to a dwelling, and the defendants have the contrary interpretation. The Cox court said that the defendant's interpretation is, quote, grammatically superior, close quote. But it did not explain how that was so, and I submit that there is no interpretation that is grammatically superior one to another, but I submit that there is a logically superior interpretation. And to show that, I'd like to first read the language the way the plaintiffs believe it should be read and determine whether that makes sense. Under that view, it would bar discrimination in the provision of services or facilities in connection with a dwelling. Does that make sense? Yes, it does. It makes perfect sense. We can all understand what services in connection with a dwelling might be. For example, garbage collection. And we can all understand what facilities in connection with a dwelling might be. For example, sewer mains. But now let's read it the defendant's way. Under that interpretation, the services or facilities have to be in connection with the sale or rental of a dwelling. Now, maybe we can figure out what services in connection with sale or rental of a dwelling means. It might be title insurance, for example. But what would be facilities in connection with sale or rental of a dwelling? I suppose it could be a room where people sit to sign the papers. But I submit that that is a trivial example which highlights the fact that the logical connection between services or facilities is much stronger to the word dwelling than it is to the word sale or rental of a dwelling. And reading the statute this way has the added advantage in that it makes the statute read in conformance with Section 3604F2, which covers disability discrimination and which doesn't use the word therewith. Instead, it uses the word with such dwelling, clarifying the language of the statute. And I think it's important to note, as is noted in the briefs, that there was no indication in the legislative history that the coverage of the disability discrimination was intended to be any different from the coverage of the provisions concerning race, color, religion, et cetera. Now, that's the first way that I refer to that the statute can be read. The second way is to focus on the words privileges of sale or rental of a dwelling and to recognize that the privileges of sale or rental of a dwelling can include privileges attendant to occupying that dwelling. Now, Judge Posner in the Halperin case conceded that this interpretation was semantically possible, but he limited that reading to a constructive eviction setting. He said if the privileges of occupying the home were taken away from you because of a constructive eviction, well, then that could qualify under the statute. But there is no constructive eviction clause in the language of the statute. This is statutory construction. We look, we find no constructive eviction clause. And, indeed, such a clause would be redundant because Section 3604A already bars discrimination that makes a dwelling unavailable, which would cover, of course, a constructive eviction claim. The Cost Court ---- Kennedy. Isn't there a problem about connecting therewith with privileges? If the suggestion there is that the term does not, the word does not equally run to terms and conditions? Your Honor, I think under the second of the two interpretations that focuses on the words, the word privileges, one doesn't even need the second clause. One doesn't even need or in the provision of services or facilities in connection therewith. Under that interpretation, privileges of sale or rental of a dwelling would include privileges attendant to occupying the dwelling. But I agree with Your Honor's observation that the therewith does not relate to the terms, conditions, or privileges. But under the first interpretation that I heard ---- I agree with that. I'm just trying to follow you through the text. There is a canon of a Houston Generous that would suggest that privileges is a term, is a word that is captured as a further example of terms, conditions, and so forth. Yes, Your Honor. Although I think privileges is broader. There's probably another canon that goes the other way, because canons always go one way or the other. And why bother with privileges if it's just terms or conditions? It must be intended to add something, as one canon would say. I certainly believe the word privileges connotes something a little bit broader than terms or conditions. I think that's why it's there. And as I noted, Judge Posner conceded that it could include the privileges of occupying the dwelling. But he limited it, again, to a constructive eviction setting. And as did the Cox Court. But many courts, including the Ninth Circuit, have applied. The same problem. You're going to sit down with your five minutes off? Yes, Your Honor. Do you have anything to say about the regulations interpreting the ---- Let me just ---- Yes, I will. I will be happy to move to that. Because you've got a minute and a half. I'll be happy to move to that. I'll just note that Harris v. Itzhaki did not have any constructive eviction dimension to it. That is a decision of this Court, applying 3604B in a post-acquisition setting. And further, the Hanse and DiCenzo cases cited by Judge Posner also did not include constructive eviction as part of their rationale at all. Now, I don't believe we need to get to the legislative history and the regulations. I think the reading of the statute makes it sufficiently clear. But if we go to the regulations, HUD has adopted Regulation 100.65. And this regulation clearly prohibits post-acquisition conduct, such as failing or delaying maintenance or repairs of sale or rental dwellings, and limiting the use of privileges, services, or facilities connected with the dwelling, clearly covering post-acquisition conduct. The Cox Court disregarded the regulation because of the prefatory language. And it theorized the regulation was about constructive eviction. But again, there's nothing in the regulation about constructive eviction. And I submit that the prefatory language is entirely consistent with the second of the two interpretations that I've offered, focusing on the word privileges. And it is not inconsistent with the first interpretation because it does not purport to be an exclusive listing of discriminatory practices. Can I ask you a different question? We'll be lenient on time, thank you, for your rebuttal. But I'm troubled by the scope of this act, under the plaintiff's theory a little bit. Is there any authority that involves a situation where, as I under, that we have here, where, as I understand it, the city and county were dealing with funding and zoning and planning and tax issues that related not they didn't have a specific relationship with these plaintiffs, in the same sense that a landlord or even a utility or some other entity or insurance company or other people might? Is that possible? Yes, Your Honor. They were not the people who made the sale or did the rental. But they are the people who provide services. No, I think it's more than that. The question is, assuming you're correct that it goes beyond sale or rental, and you had discrimination prohibited by, prohibited insurance companies from discriminating or someone else from doing it, does it apply to cities or counties who are making general policies? Yes, it does, Your Honor, if they're providing services or facilities and they're The difficulty courts have had, as I think Judge Schroeder acknowledged, is where does it stop? Yeah. And courts have adverted to a remoteness concept that they have used to determine whether particular What case authority under the Housing Act deals with this kind of a situation? Where would we go for? I understand in tort, in other kinds of statutes, there may be environmental, there may be remoteness concerns. Well, I think the Where do we look here to find that? I believe the Mackey case deals with that. I believe that was a Fourth Circuit decision which adopted the broad interpretation that the plaintiffs advanced. It was a case involving hazard insurance. The court ruled that hazard insurance was outside the scope, nevertheless, was outside the scope of the statute. I don't think courts have focused very clearly on how you would do that remoteness analysis. The Cox Court clearly was troubled by the same thing. That case involved citing a dump and not, allegedly not enforcing laws against illegal dumping. And the court was clearly troubled by that. And it felt that it was too remote. But I don't think that that problem means that one does violence to the statutory language. Well, you say, but it may help to inform statutory language. I found myself wondering whether the issue is not the issue of the temporal extent of the statute might be defined in terms of the difference between a rental, which goes on for some period of time and then stops or maybe is renewed, a rental and a purchase of a property. Yes, Your Honor, I see that distinction. I think if one were to say that post-acquisition discrimination is only illegal in the rental context because of the continuing nature of a rental as opposed to a sale context, that would create a very, very big difference as applied to the provision of services or facilities, because that would suggest that a city could discriminate in the provision of water or sewer or other services with respect to people who own their homes but not with respect to people who are renting their homes. But the ‑‑ as this case, I guess, illustrates, one would ‑‑ if the statute is to be read with ‑‑ in the way you suggest, then claims would accrue for years and decades potentially. Potentially it could have a far‑reaching scope. Well, I'll tell you, I was thinking about it in comparison with the California statute, which I take it you think is cognate with this, though possibly a little broader. As I understand the California cause of action, it is aimed at facilities that have state funding, that that becomes an ingredient. Yes, Your Honor. Now, isn't that a distinction which lends itself at least to the possibility of considerably greater breadth for a statutory scheme in the state interest and a federal statutory scheme which is, as I understand it, would make no distinction as to whether the services or privileges were ‑‑ had governmental funding behind them at all? That's correct, Your Honor. We do think that the state statute is even more clear that it prohibits post acquisition discrimination because of its use of the word hold property and declaring that it is a civil right for people to be able to hold their property. And if the statute is to be read to apply only to state funded activities, then we, I think, could deal with that on remand. But because these claims were dismissed, that has not been addressed in any detail. If the federal statute is to be read with the breadth that you suggest, do you have any real reason for choosing between whether you proceed under the federal statute or the state statute, assuming for this purpose, of course, that you have some federal claim that gets you back into court? Well, obviously, Your Honor, if I need to prove the use of state funding for one claim and not for the other claim, then I would prefer to pursue both claims. There may be a difference in the remedies. I don't know whether the plaintiffs would – I assume we would pursue both claims, Your Honor. Okay. I think that we will give you a few minutes for rebuttal. Thank you, Your Honor. Very long. Thank you. Good morning, Your Honors. John McDermott for the city of Modesto. So I'm going to take 10 minutes and then turn the podium over to Mr. Cassidy for the county. We'll be leaning in the time you have, Your Honor. Let me begin with sewers. By agreement of the parties, the only municipal service and issue as to the city is sewers. More specifically, the infrastructure requirement for a Measure M vote that appellants allege have frustrated the holding of a Measure M advisory vote for two of the four islands in which plaintiffs reside. The district court, in my view correctly, barred the sewer claim on statute of limitations, and I want to address a contention on pages 35 and 36 of appellants' reply brief that the claim did not accrue until 2003. I think the way they put it was there was no discrimination until 2003. So let's just ask you a question. The city is involved in the sewer claim and also in the tax-sharing claim? MTSC. My comment, my statement was the only municipal service issue involving the city is sewers. I wasn't speaking about the annexation claim, which appellants do not regard as a municipal service, even though they characterize it as such in their original complaint. But I'll deal with that issue separately. But as to services themselves, sewer is the only issue asserted against the city, and that issue is the infrastructure precondition to a Measure M vote. The contention that the claim did not accrue until 2003, I would submit, is simply not a fair analysis, because the nub of plaintiffs' claim is the granting of a Measure M vote to four substantial islands in 1999 and 2001, and as well the rejection by the city council of a motion to give a Measure M vote to all the islands. All of those events that I just listed occurred in 2001 or earlier outside the limitations period and triggered the statute of limitations. The only events offered by the plaintiffs in response to the statute of limitations ruling by the district court were decisions in 2003 by the city council to hold a Measure M vote for two substantial Latino islands, one of whom was exempted from the infrastructure precondition requirement. I can't see how it is possible to describe those acts which provided services to Latino islands that have never been provided to any Anglo islands as a discriminatory act that can get around the continuing violation, that can establish a continuing violation exception to the statute of limitations. It seems to me clear that those events in 2003 were not discriminatory. They couldn't have injured the plaintiffs of the two islands, Rouse, Colorado, and Hatch, Midway, that don't have sewer. And as a result, the district court decision on the statute of limitations as to the city sewer claim should be affirmed. Now, on the merits, I think the appellants in their reply brief lose sight of the fact that the infrastructure requirement is a precondition to a Measure M vote. And when you consider Measure M votes, the six islands receiving Measure M votes are 67% Latino. That's the real measure of discrimination when you get to the merits. The 67% figure includes all four of the four insubstantial islands that the appellants are focusing on. It includes Robertson Road, for whom an exemption from the infrastructure requirement was given, as well as Shackleford, which got sewer and infrastructure. When you take into account the entirety, as I think we're – as I think the court has required – the district court was required to do, you don't just look at a piece of the facts that support your argument and ignore other facts that undermine it. You've got to look at the entire data set. And when you do, it's clear there is no discriminatory impact here. This is not the case. Kennedy. Are you inviting the summary judgment court to be weighing the evidence? I was just about to respond to that question, Your Honor. I don't think there was any weighing, inappropriate weighing of the evidence here. What there was was the selection of a measure or standard of discrimination, which is let's look at all six islands that got Measure M votes and see if it's discriminatory. And when you go through that analysis, when you – when you select the measure or standard, which results in a – the 67 percent figure, what you've done is established there's no discriminatory impact. The district court didn't weigh the evidence. He selected a measure or standard of discrimination on facts that are undisputed that prove no discriminatory impact and that render the other facts that appellants try to bring into this immaterial for summary judgment purposes. There's no weighing of the evidence. And the evidence is quite clearly that the city has acted both in providing sewer and in extending Measure M votes, which, after all, the infrastructure requirement is a precondition to the Measure M vote. It should be the measure of whether there's discrimination. And in this case, it's quite clear there isn't. This is a marginal claim, and it seems to me that the district court decision should be affirmed. Let me move on to the master tax sharing agreement, which we contend Judge Beck clearly barred any MTSA claim regarding annexation. And I want to address some, what I think is a fairly serious mischaracterization of the record in the poem's reply brief. Judge Beck, if you ‑‑ I think it's very important in judging whether there is a surviving MTSA claim regarding annexation to look at Judge Beck's decision. And if we look at the excerpts of record page 1630, the very heading, heading B under analysis says, Clarification of allegations concerning defendant's failure to provide municipal services in a nondiscriminatory manner. These are the allegations that Judge Beck permitted. And if you go to 1631, he goes on to say that facts regarding infrastructure are permitted, infrastructure, not annexation. What appellants do in their reply brief is suggest that somehow or other, because they filed a third amended complaint containing assertions about annexation, that somehow or other Judge Beck approved them. That's not what happened at all. That is a very serious mischaracterization of the record. What happened here is Judge Beck issued his ruling. Plaintiffs requested reconsideration from the district judge who affirmed Judge Beck's decision. And then what plaintiffs did was file a third amended complaint, which violated or was contrary to the ruling that Judge Beck issued, an argument we made in the summary judgment filings before the district court. It is simply an inaccuracy to point to the third amended complaint and say Judge Beck somehow or other approved all of the language in the third amended complaint. He did no such thing. And the reference to the prayer in the complaint, I mean, that's contrary to Judge Beck's argument. But more than that, in Federal practice, the prayer is not considered part of the complaint. So I think it's important to understand here that Judge Beck precluded any MTSA claim regarding annexation. What he permitted was an MTSA claim to the extent plaintiffs could somehow relate it to infrastructure. Sotomayor, the question is, was he right? The question is, was he correct in doing so? I'm sorry? The question is, was he correct in doing so? Well, that's my next point. I'm glad you asked, because it seems to me what appellants are doing in their brief is asking you to reconsider Judge Beck's opinion, even though they don't appeal from it. And I would point out to you, if we go back to where we were at the time Judge Beck issued his opinion, we were on the eve of trial. And what Judge Beck was saying is annexation hasn't been an issue for discovery. It's been out of the case since the beginning. And it's unfair to raise it at this late stage in the game. That's a discretionary decision that appellants don't even address. I don't see how you can overturn Judge Beck's decision, even if you were to consider it, on, given the fact that what he did was make a discretionary decision, that it would be unfair to allow that issue to be raised at that point in time. Okay. You are into your colleague's time. One last comment is on the FEHA claim. The city was only a party to two of the four motions, summary judgment motions. And on both those summary judgment motions, the plaintiffs did not oppose summary judgment on the FEHA claim. They offered no opposition at all. And the standard here is whether the district court abused its discretion. I don't see how the district court can be held to have abused its discretion in the two motions affecting the city when the plaintiffs never opposed it. Thank you. Good morning, Your Honors. Terrence Cassidy on behalf of Appellees Stanislaus County and Stanislaus County Sheriff. May it please the Court. The undisputed evidence based on the analysis of the Arlington Heights factors in this case establishes that the county and the sheriff did not discriminate against plaintiffs in the provision of municipal services, did not specifically intentionally discriminate against the plaintiffs in the provision of both infrastructure, which we know is now limited to just the sewer system or the infrastructure for sewer, and likewise in the provision of law enforcement services. There was a question raised about weighing the evidence. And I think what's extremely important is that the Arlington factors require that in order to make a determination by the district court and by this court on a de novo review, we must look to the evidence, not necessarily weigh the evidence one side or the other, but we must look to the evidence to determine whether or not through the Arlington factors that are enunciated there can be and is intentional or sufficient evidence of intentional discrimination to give rise to an issue of fact that should go to trial. And in this case, it did not exist. We know in terms of the infrastructure regarding the sewer system, first of all, we have asserted on behalf of the county that the plaintiffs that arise out of the Rouse, Colorado neighborhood do not have standing because they, in fact, have sewer. And that still remains an issue for this court as to whether that claim can go forward on behalf of that neighborhood. Second, we know that then leaving the Hatch Midway neighborhood is the only neighborhood complaining of sewer or lack of infrastructure being installed by the county. There's no evidence of direct, no direct evidence of discrimination. That's undisputed. So all we can look to in this case is circumstantial evidence. Well, the circumstantial evidence does not give rise, as presented by the plaintiffs in this case in this record, does not give rise to an inference of intentional discrimination. Specifically, what do we look at? Well, we look at, as a starting point only, the impact. Well, we see that as we analyze, the analysis of the impact is that the neighborhoods, all of these neighborhoods were built without this infrastructure. So the starting point is not that these neighborhoods had some infrastructure or the county was putting some infrastructure in some neighborhoods and not others. All of these neighborhoods were constructed without the sewer infrastructure. The question then becomes where did the county install, if at all, sewer infrastructure to determine whether or not there was some discrimination against the plaintiffs for the county failing to put in that infrastructure. And in this case, we see that the sewer infrastructure that was installed was placed in two neighborhoods. Shackleford, and at the time the Shackleford infrastructure was put in place, it was majority Latino. And second, Robertson Road, which is one of the plaintiff neighborhoods in this case, but that which was already in the planning stage before this case was filed, and it was also majority Latino. Now, the only other infrastructure that has been put in place by the county in the type of similarly situated neighborhoods as we have in this case, which are the islands that are within the sphere of influence of the city of Modesto, are twofold. Those are, oh, and I have to back step because I apologize. I left out Brett Hart. The other plaintiff neighborhood that received sewer was Brett Hart, and it was majority Latino at the time that it received the sewer in the mid-'90s. So when we look to the comparison of whether in some fashion the county has failed to provide sewer infrastructure in particular to a Latino neighborhood as asserted by the plaintiffs, and I believe we're just down to the Hatch-Midway neighborhood, there has not been either intentional discrimination or any inference of discrimination in the provision of those services. So now we take the next step, and we look to the analysis of what other infrastructure did the county install. Well, there were two other aspects of infrastructure. The primary aspect was the storm drainage. Storm drainage was placed in the Salida neighborhood, in the city of Salida, in actually the old area, and we've pointed out that, in fact, the redevelopment area, the old Salida city, was predominantly Latino. But that aside, because that wasn't one of the decision-making factors, that aside, we know when the infrastructure of storm drainage was put in Salida, it was not similarly situated to the plaintiff's islands because Salida had a very narrow window of time upon which it could obtain USDA loan money as a rural residential neighborhood, and the county acted on that, obtained that money, was able to match that money through an additional loan, and was able to fund that storm drainage. None of the plaintiff neighborhoods were entitled to USDA money, so they're not similarly situated in terms of this analysis. Next, we look to South Ceres because South Ceres did receive some infrastructure. What was the basis for the infrastructure in South Ceres? The infrastructure in South Ceres was placed because South Ceres was a redevelopment area, and the redevelopment area, of course, can only benefit those who are providing the tax monies toward that particular redevelopment area. So again, none of the plaintiff neighborhoods, and again, it should only be limited to Hatch Midway, are similarly situated except those that are redevelopment because we know now that the only money that's used for South Ceres for redevelopment purposes has to come from South Ceres and has to be used for South Ceres. So then we look to the next step, and we have Keys. Keys, historically, was part of the redevelopment plan. It was to place storm drainage in Keys. So is Keys really somehow out of the normal sequence of events, as Arlington has described? Well, no, it's not, and the reason it's not is because we look to the historical background. And in Keys, it was all part of the storm drainage need for Keys was in the original redevelopment plan in the early 90s. It was implemented into the plan. That was carried out in the same fashion and in the same order that the redevelopment plan was originally determined would be appropriate. We then look what happens, what changes in Keys. Well, the complaint is Keys cost more than we thought it would when it was first determined to be part of the redevelopment plan because the expenses have gone up. There's been growth surrounding the old Keys neighborhood that now is going to make this much more expensive. Well, likewise, Keys was part of a redevelopment area, so it's only the money that can be used in that's developed by Keys for redevelopment in that area. And two, we now have the Federal Environmental Protection Act, which is now going to increase the cost. None of those factors apply to the plaintiff's neighborhoods, and therefore the Keys truly is not similarly situated. So when we look at this from both the big picture but yet the minute picture, and again, I should mention that certainly the economics, specific economics of the expense of a project doesn't denote some type of discrimination. So the fact that the county has to ultimately pay more for one project more than another is not evidence of discrimination. So we then drop back and I think look to was there a rational basis for the 2004 priority list, and yes, there was. And the reason there was is the county determined, as the list was developed by Mr. Jim Duvall, that all of the areas had a need for infrastructure. The initial four or five on the list were already either in planning or already underway. Help me out for a moment. You're talking about the Civil Rights Act now? Yes. So essentially what you're arguing is that whatever mess there may be, it's not because they haven't adequately shown discriminatory intent? Correct. Okay. Is somebody going to talk about the law enforcement claim? Yes. I'd be happy to address the law enforcement claim. And I just wanted to finish the two last points were on the rational basis, but I think we've covered that in our brief. So in the municipal services for law enforcement, what plaintiffs have done is they've tried to focus on just the dispatch time. And important, what the county has brought forward is what is both the response time, meaning the time from the call the deputy receives, the call, and the time they arrive on scene. And we've shown statistically that the plaintiffs are. Why is that relevant if you have to go a shorter distance to the Latino area than you do to a white area? So what's the relevance? Isn't the relevance when you send them? If it takes 20 minutes to dispatch a car to the Latino area and five minutes to a white area, wouldn't that be enough? I don't know that the plaintiffs have adequately set forth a record that all of the Latino neighborhoods are on a shortened distance. I'll submit it, but I'll switch to. This is your question. You said you can't look at it in terms of dispatch time. You have to look at it in terms of how long it takes to get to the place. And I said what's wrong with looking at just the dispatch time? Because the dispatch time is operated by the Joint Powers Agency, which is the combined emergency dispatch agency. What we know is the Stanislaus County Sheriff, who has control over the deputies from the time they get the call, respond as quickly as possible, and particularly in priority one calls. But taking Your Honor's concern for a moment, it's not either the dispatch time, arguably, or just the response time. It's the total response time from the time the call goes. I'm questioning. Why is it not enough? Let's assume, forget all the other issues, you've got one office for one entity in the city, and they don't send cars to the Latino areas until 20 minutes after they get a call, and they do send them to the white areas five minutes after they get a call. That would seem to me to show the discrimination. Well, number one. Much more relevant than how long it takes you to get to a Latino area or how long it takes you to get to a white area. Well, I have to back up then, because we have to look to whether that's generated by a municipal customer policy on the part of the county. Okay, that's a different question. But I would say, no, it's not. So they don't reach what would typically be required as to the control issue over a consolidated emergency dispatch agency. But, Your Honor, I think we have to not take it just from that, but we have to look at what the impact is. And what the district court did and what the defendants submitted to the court was the evidence of the overall response time. And we know that if statistically there's less than a 30-second difference between the overall response to all predominantly white calls versus Latino calls in those Latino neighborhoods, then there's not a statistical correlation that is sufficient to show intentional discrimination. Mr. Cassidy, is it enough to say, well, the response time is all about the same for everybody, so why are you worried about the fact that the dispatch time seems to be significantly longer in the plaintiff neighborhoods? There seem to be discrepant figures presented to the district court by the two parties, but assuming that that is a profile which is reflected in your own figures, is it sufficient to say, well, we'll get there within 30 seconds, it's too bad that we don't send them off as quickly? Sure, if we sent them off in six minutes rather than seven and a half, then to be sure the response time would be shorter, but that's not our obligation. And at the same time, perhaps you can enlighten me on what strikes me as an odd contention, that the county has no responsibility for the agency that does the dispatching. The agency that does, and that's the two distinctions I will make in response to Your Honor's inquiry, and the first is the agency is, the dispatch agency is a separate agency. It's governed by a commission that only has part of that commission as a member from the county. So when we look to this, the reason it's important to look to response time is to see what's the county's motive. Number one, the county doesn't have ultimate control over this dispatch agency. Number two, the response times the county does have to show whether there's a customer practice on the part of the county to respond more slowly to Latino neighborhoods is negated by the fact that our response times from the time the deputy gets the call is quicker. Third, when we look to the overall response time, those are averages, Your Honor. So I'm not saying every call, nor was the evidence submitted that every call is 30 seconds later. Many calls may be faster. Some are slower, but it's within a 30-second variation. That does not show an intentional. Number one, we don't have control over the agency. Number two, it doesn't show intentional discrimination on the part of the county. The county, through what it controls, makes every effort to be there promptly and accurately. Okay. And that was the evidence. With respect to the dispatch agency, are you suggesting really that the plaintiffs should add another defendant, this commission, about which I haven't heard before? Well, Your Honor, as a matter of fact, the plaintiffs did have the dispatch agency as a defendant. However, that dispatch agency was dismissed, and since that time, the plaintiffs made no effort to rejoin the dispatch agency, nor do I believe they've established a sufficient policymaking or other official relationship between the county and the dispatch agency to say that a Monell claim would flow from that type of relationship. And why was the dispatch agency dismissed? It was dismissed because the nature of the claim being asserted against the dispatch agency, the district court determined would not flow to that agency. So I'll let plaintiffs address that. But we were not representing, I should also make clear, that agency at the time it was brought in as a party. They were represented by separate counsel. So with respect to the master tax sharing agreement, one comment, and I will submit it, Your Honors, and that is I believe that the annexation claim is barred to the extent it relates at all to the MTSA agreement. However, to the extent there was some disincentive because of the MTSA to install infrastructure, that's negated by the fact that the infrastructure that's been installed has been to Shackleford and Robertson Road, both of which are predominantly Latino neighborhoods. And that's all about the sewage? Sewage, yes. Okay. Thank you, Your Honors. I need to begin with an apology for Judge Pollack. I confused two of our claims in answering your question. Our claim under California Government Code Section 11135 requires proof of state funding, but the claim under the California Fair Employment and Housing Act does not. With respect to the questions of fact, the Arlington Heights case lays out a number of ways that one can prove discriminatory intent. They are not exhaustive. The Court's supposed to look to the totality of the circumstances, but they include a clear pattern of discrimination. They include adverse impact, historical context. We've shown all of those things for each of our claims. We've also shown, certainly in the case of the MTSA and the Measure M infrastructure condition, that the reason put forward by the defendants for why these distinctions were made are not credible. That was put in as part of our prima facie case. It should be evaluated as part of the prima facie case, and we certainly think that it gives rise to an inference of intent when someone says, well, the reason that we excluded your neighborhood from the MTSA is because you have unmet infrastructure demands, and yet those same unmet infrastructure demands exist in the white neighborhoods that were not excluded. Do you, your MTSA claim, is that, is it necessary for you to prove the annexation aspect of it? The annexation aspect of it, at this point, Your Honor, the claim that we are arguing is that the discriminatory exclusion of the Latino islands has ill effects in terms of deterring county infrastructure development, which, of course, exists prior to annexation, and also that it deters organizing for annexation. So we don't think that we need to prove that we have applied for annexation. Indeed, this policy change ---- Are you challenging the district court's ruling that it's too late to claim annexation as a violation? We are not challenging the district court's ruling that there's an affirmative duty to annex us or that we should have been annexed. We are simply saying that there's an impediment that's been erected to our moving down that road, and that impediment is discriminatory. And are you claiming that in the infrastructure discrimination claim, are you talking about more than sewers? The infrastructure discrimination claim, we're certainly talking about sewers. In two of the neighborhoods, we're talking about storm drains and sidewalks and curbs and gutters for all of the plaintiff neighborhoods. And we have put in details about the bang for the buck and the considerations that the county supposedly was supposed to go through in determining a prioritization. We think that we've shown departures from procedural sequences that would be normal for generating a priorities list, another of the Arlington Heights factors. And we think we've shown substantive considerations that strongly favor adoption of a policy different from the one that the county adopted. And what about the argument about the dispatch agency, that that's not the responsibility of the county until they get orders from the dispatch agency? Your Honor, we raised a question of fact, as found by the trial court, that there's a question of fact about the county's control over the dispatch agency. As the chief of the Modesto police testified, and I believe this is in the brief, the city and the county tell the dispatch agency what the dispatch directives are to be, how they are supposed to be dispatching people. The city and the county control that. That's a question of fact at a minimum. And in addition, under California law, the county is liable for the dispatch agency anyway. It is jointly and severally liable for any violations by the dispatch agency. Your Honor asked, why isn't the dispatch agency here? The answer to that question is that it was a defendant only on the fair housing claim. When that claim was dismissed at the motion to dismiss stage, it was out of the case. Perhaps we could have tried to bring it in on a different theory, but we did not. That's why they're not here. If I may, just to conclude, Your Honors, I'd like to provide a citation to California Government Code sections 665, I'm sorry, 65583 through 65588, which describes the process of preparing a housing element and the general plan that the city and the county have to participate in. And we think that the Court should take judicial notice of that process because it bears on the knowledge that the defendants must have concerning the ethnicity and characteristics of populations in the entire region. And to conclude, we request that this Court reverse the grant of summary judgment and remand the case for a trial that we believe the plaintiffs so richly deserve. Thank you. Thank you, counsel. The Court appreciates the arguments of counsel, and the case just argued. The case matter is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned.
judges: Schroeder, Reinhardt, Pollak